Hearing from Mr. Doretsky, whenever you're ready. Good morning, Your Honors, and may it please the Court, Shai Doretsky with Jones Day representing Macy's. The union in this case first tried to unionize the entire store and failed. It then tried to unionize a single department, the Cosmetics and Fragrance Department, which ultimately voted to unionize by the narrowest of margins. Especially in that situation, the Board has an obligation not just to list facts, not just to list similarities and differences, but to explain the significance of the factors on which it bases a unit determination. That is the only way to ensure, and again, particularly in this kind of a gerrymandering situation, the only way to ensure judicial review. This Court hasn't hesitated, for example, in the Purnell's Pride case, to reverse the Board where it has simply tallied factors without explaining their significance, and it should do so here. The Cosmetics and Fragrance Department shares numerous similarities with other sales associates in the store. Most fundamentally, all sales associates at the Macy's store are engaged in the same fundamental task of selling merchandise, and they're doing so pursuant to fundamentally the same terms and conditions of employment, the same employee handbook, evaluation criteria, benefits, hours, and so forth. Against that, the Board cited four factors that it believed justified a separate unit for the Cosmetics and Fragrance Department, and none of those withstand scrutiny. There's no limiting principle for why any of those wouldn't justify a separate unit of every department of every department store in the country. The four factors on which the Board relied, that it's a separate department in a distinct area with separate supervision and purportedly limited interchange. First with respect to the distinct area, it's a distinct area within a department store, no more distinct than this podium is from the benches behind me. This Court in the Purnell's Pride case faulted the Board, reversed the Board, for relying on precisely that kind of rationale, where there were distinct areas that were nonetheless close together within the same facility. Second of all, the fact that it's a separate department, there are many reasons why businesses will structure their businesses using separate departments. In this case, for example, there's testimony in the record that separate departments were used for inventory control. That has little or nothing to do with the policies that underlie a unit determination. As this Court has previously explained, the sorts of factors that matter are the ones that fundamentally affect the working conditions of the potential unit members. Their wages, their duties, their skills, their qualifications. Not simply a departmental line that may be drawn by an employer for lots of other reasons. The Board relied on separate supervision. It's true that within a 150-employee store, most, I think, most stores are going to divide up their stores so that there are separate immediate level supervisors and not have one manager responsible for 150 employees. But all of the department managers within the store report to the same store manager and all are applying, again, the same fundamental overarching criteria for evaluating their employees in terms of benefits and so forth. And so, again, in the Pernod's Pride case, the Board had relied on separate supervision as a factor but not explained why that outweighed all of these significant commonalities. And this Court reversed the Board, explaining that it needs to provide a justification for why the separate supervision outweighs all of these other overarching similarities among all employees within the business. Let me ask you about, you rely on the Lundy case from the Fourth Circuit, where you say they invalidated a similar test that's functionally equivalent. And looking at that, you know, the Board says, well, there the first step was just an automatic presumption, whereas here there is this similarity inquiry at the first step. But, you know, at first glance, when I looked at it, it seems to me the first stage where the, in this test that's currently being applied, doesn't have that, isn't that forceful. I mean, it's not going to be that hard to overcome. But then I looked at, there was a decision last year in Neiman Marcus, where the NLRB denied a proposed unit of all women's shoe sales associates. So doesn't that mean this is different than the earlier standard that was, the Fourth Circuit had a problem with, and that there's at least this one case out there where the NLRB has said that the first step hasn't been met. So there's at least some teeth to the first step. No, Your Honor. The only cases in which the Board itself, not regional directors, which have no precedential value, but the Board itself has reached the conclusion that you're suggesting, have been ones in which the proposed unit has not tracked the departmental line. So the Board is attaching talismanic dispositive significance to the departmental line. And as I said, the departmental line may or may not track factors that significantly affect the terms and conditions of employment of the proposed unit members. That's what the Board has to explain. Employers can have lots of reasons for drawing departmental lines that don't necessarily track the considerations that underlie a unit determination. With respect to Lundy more generally, first of all, the Board itself in specialty health care justified the test that it was adopting as supposedly being the same one as the test in Lundy, the same test that the Court struck, that the Fourth Circuit struck down. So the Board itself is on record saying this is the same test. Second of all— Although they also drew from the D.C. Circuit opinion when they articulated this test. Blue Man Vegas, didn't they rely on that as well? They did. They relied on Blue Man, and Blue Man, as we explain in our brief, is wrong for a couple of reasons. One is that it justifies the standard at the Board level based on appellate standards of review. It's true, of course, that appellate courts give some measure of deference to the Board, but the Board, when it's reviewing the unit determination in the first instance, is not supposed to defer to what the proposed unit is. It's supposed to reach an independent determination in each case about whether the unit's appropriate. Second of all, Blue Man Group relied on cases from the accretion context, and the Board in this case has imported that accretion test into the initial unit determination context. This Court has explained in the past that the accretion test is significantly different and significantly more stringent than the initial unit determination test, as it should be, because in the accretion context, what you're doing is you're taking employees and you're adding them to an existing unit without giving them a right to vote on that. And in order to satisfy that standard, that's appropriate in the accretion context only when there is a virtual identity of interest between the employees that you're adding and the existing group. That's the only way in which it makes sense to add them to an existing group without letting them vote on it. It is way too high a burden, however, and a very different burden, to require an employer to show that there is that kind of virtual identity, which this Court has said is rarely satisfied, in order to overcome an initial unit determination. And so the Board did rely on Blue Man Group, but Blue Man Group, for those reasons, was simply incorrectly decided. We also attacked specialty health care as being an unexplained departure from prior Board decisions. Yes. And I agree with some of these cases, like the poker dealer ones, seem to be hard to distinguish from what the Board is doing now. But specialty health care was affirmed by the Sixth Circuit. So by the time, when this case is at the Board, the case here involving Macy's, specialty health care is now precedent within the Board. So how long is it that you can challenge a prior Board decision that's being relied on here as being an unexplained departure from precedent? I mean, 10 years, can people still say, well, back in 2010, specialty health care was an unjustified departure from precedent? The Board itself takes the position that when a court of appeals rules on a test like specialty health care, that's only binding on the Board within that circuit. And so if the Board's going to take that position, that when it wins, that's only binding, or when the position of the Sixth Circuit's only binding within the Sixth, then when we go to a different circuit, of course, we're free to challenge the specialty health care standard. Well, I'm not saying specialty health care, you certainly are, and you can say that, as you've argued, this standard is inconsistent with the statute, that it creates too much of a presumption in favor of the union's selected unit. I agree that's all fair game. But on the particular argument you make about it being a departure, that's where it does seem strange to me that even though it's now Board precedent, I mean, in 5 years, can someone still be arguing it was in a circuit that hasn't looked at the case, that it was an unjustified departure? The Board is free to depart from past precedent if it provides an explanation that justifies that departure and passes judicial scrutiny. In this case, the Board has yet to provide an explanation for why it has departed from precedent. In fact, refuses even to fully acknowledge that it's departed from past precedent. And so, yes, until such time as the Board provides that explanation, parties are free to challenge the framework that it's applying, and of course, to take that to different circuits, because the Sixth Circuit's decision is not binding in the Board's own view nationwide as to the applicability of specialty health care. But in this case, the Board was not creating the new precedent, it was applying specialty health care. It was, but it was asked to reconsider specialty health care on the basis that it had yet to ever provide a reasoned basis for its departure from past precedent. If I could go back to the earlier argument, to the last of the factors on which the Board relied, it purported to identify a lack of interchange between the Cosmetics and Fragrance Department and other sales associates. A couple of responses to that. One, over the course of a two-year period, nearly a quarter of the Cosmetics and Fragrance Department either came into the department from elsewhere at the Macy's store or left the department for other positions within the store. Again, Pernell's pride is directly on point. There too, there was evidence that the Board simply failed to grapple with about significant movement in and out of the department, and this Court reversed the Board for nonetheless finding that there was a lack of interchange. The Board here has no explanation for how a turnover of nearly a quarter of the department over two years within the store is a lack of significant interchange. Second of all, on a daily basis, employees are trained to cross-sell within the store. It's Macy's policies that employees have to help one another out whenever any customer needs assistance from any department. Employers are to assist with that. Of course, if customers want to ring up items from multiple departments at one register, there's testimony in the record that that happens and that, of course, it's Macy's policy to accommodate that. And so this is fundamentally a department store where the whole business model is that all of the employees are working together towards the same fundamental goal, which is selling merchandise. The idea that in this context there is no interchange between one department and another simply makes no sense. And again, the Board hasn't explained other than the Board has cited facts that it believes it's found here, but other than merely citing factors and tallying them up, it hasn't explained what their significance is with reference to the factors that bear on a unit determination. And for that reason alone, even apart from the specialty health care issue, the Board's order ought to be set aside. The second and independent reason, which we started to talk about, that the Board's order ought to be set aside is that the specialty health care test is impermissible. It's both contrary to the statute, and it's procedurally impermissible because it reflects a departure from past precedent without a proper explanation. What about the argument you made in your opening brief that it should have been done through rulemaking rather than adjudication? I guess I have two questions. Was that properly raised below, and two, the Board says Bell Aerospace rejects that argument. I didn't see a reply from you. What's your position on that? So, it was raised below, and with respect to the merits of the argument, this is a little bit of an unusual situation because, of course, the Board can proceed in certain circumstances through adjudication rather than rulemaking. But here what it did was it went out of its way to solicit input from a broad array of industries in order to announce a rule that was not just going to apply to the case at the moment that we develop through future adjudications, but that at the outset was designed to be the sort of far-reaching pronouncement that applies across all industries. And so, of course, the Board, as you note, has discretion in certain circumstances to proceed through adjudication. But the particular circumstances here, I think, align this more with the other Supreme Court case that we cite involving the Excelsior Board where, in a particular circumstance, they went out of their way to announce a future rule that would apply more broadly than one would expect just from an ordinary adjudication. In terms of the other reasons why specialty health care is impermissible, first of all, it's a two-part test that just impermissibly stacks the deck. It goes too far and abdicates the Board's responsibility to reach an independent determination in each case about the propriety of the unit. The first part of the test, whether there's a commonality of interest, the way the Board has applied that, the Board will almost always find a commonality of interest, so long as the union doesn't make the mistake of proposing a unit other than along departmental lines. And virtually all employees in any employer and in any department will have some degree of common interest, which is apparently enough under the Board standard to satisfy the first part of the test. Once that's satisfied, the burden shifts to the employer to make a virtually impossible showing that under the accretion standard, which the Board has transported to this context, the interests of the unit are virtually indistinguishable from others. What that does, as the Fourth Circuit found in Lundy, is it just creates an impossible burden on employers and it allows the Board to cite similarities or differences at will because it will always be able to identify some similarities and some differences without meaningfully explaining why those matter. That then facilitates the sort of incremental organization and gerrymandering that occurs here and it precludes meaningful judicial review. If I may, I'll save the remainder of my time for rebuttal. JUSTICE KENNEDY Yes, sir. MR. LORO. Yes, Your Honors. Good morning, Members of the Court. I am Greg Loro for the Board, asking the Court to refer to the Board's order. And I just want to start off with a couple of basic principles. I've heard my opponent today, but as the Court knows, the Board's decision in a unit determination is reviewed for an abuse of its large measure of informed discretion and is rarely to be disturbed. And it's important to put our discussion today in the context of what the Act requires. What the Board's looking for is whether the petition for a unit is an appropriate unit. That is, of no moment that another larger unit may be appropriate, more appropriate, or even, in someone else's opinion, the most appropriate unit. It only has to be an appropriate unit. And consistent with that, the Board begins by applying the judicially approved and longstanding community of interest principles to determine whether the unit in question is an appropriate unit. If that test is met, consistent with the fact that it's of no moment that other units may also be appropriate, the Board imposes a heightened burden on the party challenging that unit. And that's what the Board appropriately did here. Starting with the first part of the test, that this is an appropriate unit, the Board applied the community of interest factors, and it noted, the employer chose to put these employees, the cosmetics and fragrances employees, in a separate selling department. They sell distinct products. They're generally the only ones who sell those products. They have separate supervision. They work in different areas. And the record shows that the employer generally does not want its employees selling one department's And the Board also assessed whether there was any other interaction and interchange, but the record shows that what interchange and interaction there was, was limited. These 15-minute morning rallies that didn't include selling, to the extent there might have been training to help each other out in different departments, the record was devoid of substance as to how often this occurred or to what extent. And my opponent mentions, for example, transfers between departments, but as the Board found, there weren't that many. Nine transfers in and out of the department, out of a relatively large 41-employee unit, over two years, is not necessarily that significant, particularly when one considers that the interchange went one way, for the most part, generally out of the unit. As the Board noted, such limited one-way interchange does not compel a finding that a unit's inappropriate. I'll give you that there's some distinctions that the Board identified between the cosmetics folks and the other employees, but at times, you know, there are portions of the Board opinion that does seem almost like a bad law school exam, where they've identified these distinctions, but they don't explain why they matter. And so why, for example, I think the counter-manager, the fact that there were these counter-managers in the cosmetics department was emphasized by the Board, but what's the significance? I mean, who cares? Well, a couple of things, Your Honor, and I disagree with my opponent's view that the rather than explaining their relative weight and significance in the context of this particular employer's structure. And a couple of examples, the counter-managers, we're looking at the effect on the employee's terms and conditions of employment. One thing that affects employees, as anyone who's ever worked knows, is your employer's structure. Who do you report to? Who helps train you? Who assists you? Who do you work with? And counter-managers are just a different level. They're not supervisors, but they assist in making sure there's similar product training and that these cosmetics employees helping them do their job. And to give another example, and I think this is an important one. Is there anything, though, that the counter-managers make, you know, the conditions more onerous or less onerous or just the conditions are different in any way because of, other than the fact that there is this counter-manager? I think, as with anything, it depends on whom you're working with, but certainly it's realistic that having a different counter-manager, a good one or a bad one, can affect your terms and conditions of employment, but more to the point because I recognize you want to see where the board weighed the factors rather than tallied them. An example is this claim of integration. The board acknowledged, yes, I understand. This is a department store. All your employees sell merchandise. But the point is, the employer gave the cosmetics and fragrances employees a very different role in that process. So the general integration was outweighed by the specific facts that these Petition for Employees are in a different department selling different products in different areas under different direct supervision with different training. And that's another factor worth pointing out. There's a discussion here of, regardless of department, people may be hired without a specific background, and that is true. But once they're hired into this department or that department, take the cosmetics and fragrances department, they are given product-specific training. They are given training on skin types, conditions, things that apply to selling makeup and lipstick, but not, of course, to selling couches or furniture and what they call big ticket. So I think when you look at the entire record, the similarities in the Petition for Unit are significant. The differences between the two groups, the Petition for and non-Petition for Employees, are significant as well. And the board carefully weighed the factors rather than tallied them up. Also explaining, for example, we acknowledge there's some common supervision, but there's also different direct supervision, which matters to employees because that's the direct supervisor you're dealing with on a more frequent basis. So the board did assess the weight given to each factor. But I also would point out that in my opponent saying, no, we also think we can show there's almost complete overlap here or that there is an overwhelming community of interest, they really start with what I think is a false premise rebutted by the record and the board's careful findings. And I think we have to remember here, they're not just saying we have to put these cosmetics and fragrances employees together with some other department that may be more similar than some others. They're saying the unit has to include all employees at the store, or at a minimum, all selling employees, whether they're selling couches, lipstick, jewelry, Izod shirts, you name it. And in that regard, it doesn't square with the record for them to say that this is a homogenous store-wide workforce with virtually indistinguishable interest. The employer decided that that would not be the case. They chose how to structure their department. They chose to make cosmetics and fragrances employees different in material ways, and we've discussed it, being in a separate department, separate supervision, different products, different locations. I mean, the background here is the union tries to get the whole store unionized, loses that vote, and then I guess they realize most of their support, or they had majority support within the cosmetics folks, so they try for that smaller unit. Would it have been an appropriate unit, let's say the union said, well, we have the support of the cosmetics folks, the men's clothes, and the children's clothes folks. What if they try to get three different departments as the bargaining unit, because that would give them the biggest unit they could have, or they could still win the election? The question would, of course, become, had that been the petition for a unit, whether the employees in those three departments share a community of interest, so that they're an appropriate unit. Basically, that it would be practical to bargain in that context, enough for employees to vote whether to be included in such a unit, and then you would have to look, again, if the employer challenged that unit, assuming they did, you would, again, have to look. Is there an overwhelming community of interest between the employees in those three departments and the excluded employees in other departments? So it would depend on the analysis. But also, Your Honor, just to point out a couple of other things. As you noted, it's not as though the test here is insurmountable when you look at the board. Even at the first stage, just looking at whether you have an appropriate unit, there are cases like Neiman Marcus, where the board has said, no, this goes too far, and so the suggestion here that we have the board running amok, imposing an insurmountable burden, just isn't true. And again, we're talking about a framework that has been approved by the D.C. Circuit and the Sixth Circuit, and that, in the board's view, is not something new, but something based on its prior precedent. How do you distinguish the casino case? I think Wheeling Island, where the poker—I mean, most of what you've just said, oh, the employer has separate departments. I mean, I think there, there were separate poker dealers and blackjack dealers and roulette spinners and everything. So what's the distinction with the casino case? Well, I understand the similarities, and the board acknowledged them as well, but you also have to look at all the facts and some important differences. Unlike in Wheeling, the differences we have between the two groups of employees here are greater. For one thing, here, not only do the employees have separate direct supervision and common direct supervision, they're also housed separately in an employer-drawn department, which was not true in Wheeling, where the unit did not necessarily correspond to any departmental line drawn by the employer. In addition, this unit, the one here, was structured differently. As you mentioned, the countermanagers and the on-call employees who linked cosmetics and fragrances and showed how they were integrated, because those employees could sell cosmetics and fragrances, employers, and products and jump around as needed, and that distinction was not present in Wheeling. But also, as this Court has noted, any unit determination is going to be very tied to the particular facts at any given employer. So while, of course, we do look at precedent, the risk is you have to acknowledge that small factual distinctions can matter. You're looking at that employer, as this Court has noted. So I do think there was a significant distinction in Wheeling. And I think Your Honor has asked about some other issues. I just wanted to point out one thing. I don't want there to be a misconception with this idea that the Board has simply imported improperly a different test from the accretion context. That's not an apples-to-apples comparison, because as you discussed this morning in probing how Lundy is distinguished, it is a different framework in the accretion and the unit determination context in the following sense. In this case where it's an initial unit determination, we're starting by just looking at whether it's an appropriate unit, applying the community of interest principles, and only if that's found and the employer or a party challenges it do we apply overwhelming community of interest. In the accretion context, as you noted, it's more strict because those employees aren't getting an election. They can only be accreted if at that point they are shown to have an overwhelming community of interest with the employees in the existing unit. It's not the same test. It may be the same language for part of the test, but the Board just didn't simply say we'll make unit determinations just like accretion. That's simply not true. And so again, in sum, the Board's decision is reasonable. It didn't just tally the factors. It explained the relative weight. It explained how it clarified existing precedent and specialty in applying this framework as the courts agreed in the D.C. Circuit and the Sixth Circuit. And so, unless the Court has additional questions, I thank you for the time. Thank you, sir. Thank you. Mr. O'Connell? Yes, Your Honor. Good morning. Alfred Gordon O'Connell. I'm the General Counsel of Local 1445. I'm here in support of the Board's arguments and decision in this case and would assert, Your Honors, that taken literally on its face, our opponent's argument in this case is that the only appropriate unit in a department store is either all of the employees or all the selling employees. And I would submit, Your Honors, that that is not a test and that is not a presumption, that the Board applies. It does not historically apply. It never has historically applied. As early as 1959, in the I. Magnin case, which the Board references and is referenced in all the briefs, the Board noted that while it does find that a unit of selling employees throughout a store is normally appropriate, the Board found in that case, and I quote, that smaller units of retail clothing store employees are appropriate when composed of craft or professional employees or where departments composed of employees having a mutuality of interest not shared by other store employees are involved. And that's precisely what we have here in this case. This single case that we're here about today is the one where the Region 1 made factual determinations. The acting regional director made a very lengthy and appropriate determination that was brought up to the Board, which reviewed, not only tallied, but weighed all of the factors in this case. So when your union goes and negotiates, assuming this is upheld for the cosmetics folks, what issues are going to be different in that negotiation than if you were negotiating for all the Macy's salespeople? Your Honor, I would point you to the record of this case, which includes the collective bargaining agreement of the unit of five stores that includes the Warwick store in Warwick, Rhode Island, where there is a unit of cosmetics and fragrance employees that was initially not part of that unit, but then voted later to join the multi-store unit. It's the only cosmetics and fragrance department included in any bargaining unit that Local 1445 represents. If you look at the issues that are in that separate collective bargaining agreement, there's an entire exhibit devoted to the cosmetics and fragrance employees. It talks about seniority and how seniority will be applied within that department. The wages and commission levels, which are very important to cosmetics and fragrance employees because they are focusing, particularly in cosmetics, on their vendors' products that they are specifically trained to sell and are expert in. That was the biggest difference, actually, is that the cosmetics department has a much bigger vendor influence. Almost all of them are dealing with vendors, but the board discounted that. It said, well, in some of these other areas, like men's clothes, there's a polo shop, and I understand that, but it seems to me there is certainly more vendor interaction in the cosmetics department, but the problem is I saw the regional director rely on that, and I see the board is saying, no, that's not a distinction. The regional director did rely on those factors. The board did not. But what the board did do is make findings of fact regarding those factors, adopted those findings that there are these differences. But in some of the areas that the board did rely on, the vendor influence comes through. For instance, when you think about the different training that the employees, the different skill sets that the employees have, the fact that the employees have different, a different manner of dealing with their product, the way the board analyzed the matter, while it didn't rely on that factor at all in making its determination, the facts really underlie the three parts of the test that we're looking at. They show that these employees have a community of interest because they have separate skills and training that are distinct. When you take that internal focus, that's the first step, by the way, Your Honors. The first step in this analysis is looking internally at whether the group, that there is a community of interest in these employees that is both internal and external, that shows what they are as separate and apart from others. And it's those factors, Your Honor, about skills and training that give these employees a community of interest with each other, with each other, and not with the other employees. It's when you get to the third part of the test, what the board now calls the overwhelming community of interest test, but frankly, in this case, it could have just been easily decided under the sufficiently distinct test, where the board is saying that these employees do not have significant enough connections with the way other employees are treated and how they are organized and how the employer treats them. I would remind the Court emphatically that this entire case is about what the employer has decided to do with the employees. The employer decided to organize them this way. The employer decided to get them involved with their vendors. The employer decided to give them separate commissions, to put them in different areas, to let them wear different uniforms, to not let them, not let their products be sold anywhere else, but only as a courtesy to allow products to be rung up at their counter. That's why, when you look at this test, it would be the same as it would under the iMagnon test, same as it would under the 10, 11, 12 cases in the retail department store context where the board has found smaller groups of employees to be appropriate, like the tailor shop. I'm confused about, because I think you portray it differently than Macy's does, this issue you had just been mentioning about, I understand there's some Macy's stores that are fully, the full sales force is unionized, and then is it that a cosmetics group at another store joined the unit at those other stores so that they're the only unionized group in their store, or is everyone else in their store unionized? I'm a little confused at how that arrangement works. Your Honor, let me answer that question, though my time is out. The Warwick department store originally was part of a unit of five stores. None of those stores included any of those cosmetics and fragrances employees. But they were all unionized otherwise? All the other selling employees were otherwise unionized. They carved out cosmetics. They had, and Your Honor, and that's precisely the point. The employer suggests here that the sky is falling, that these employees are going to be somehow treated separately, when forever, in the industry, it's clear that they have been separately treated. Those Warwick employees voted to join the union, the unit that existed with all the other employees, but yet, the party still had to carve out separate terms and conditions, including the term and condition that the Warwick cosmetics employees cannot be assigned to other areas of the store. So at one of those stores, the cosmetics people join, but at the other ones, they're still not part of the unit? Right, and Your Honor, and nothing can be drawn from case law on that, because the way the board process works, if no one complains about the way a unit is drawn, it'll never get on the record. And in this case, it's clear that, at least in the industry, in Massachusetts, where these employees work, it is common that these employees are treated separately. Thank you for your time this morning. Thank you, sir. Mr. Doreski? A few points in response, if I could. First of all, the board's treatment of the countermanager issue perfectly illustrates the problem with its opinion. I'm reading from Record 447, quote, in the context of this case, it is also significant that the cosmetics and fragrances department is structured differently than other primary sales department, as there is no evidence that other departments have the equivalent of countermanagers, period. No explanation whatsoever about why that's significant. It's always going to be possible to find some sort of significance, some sort of difference between one group of employees and another. Employees in this department are short, employees in that department are tall. What does that have to do with a unit determination? And the board's opinion just has fact after fact after fact that it cites without explaining its significance. 450 note 44 is another sentence to the same effect about countermanagers. And so, yes, the board gets deference in its unit determinations, but the deference is not absolute. This court's role is not to rubber stamp. In order for the board to facilitate this court's role, it must give explanations, and it needs to be judged in this court based on the explanations that it actually provided in its order, not based on what it says post hoc, in briefs, or at oral arguments. What if there was a store where one group, just say cosmetics, was commissioned and no other salespeople in the store were commissioned? I know that's not this case, because there were people, non-cosmetics, who were commissioned, but in that scenario, would it be appropriate to have a bargaining unit just for the department that's commissioned, since that goes right to the core of what's bargained over in a CBA? I don't know if that fact alone would make it significant, because I think you'd have to look not just at what factors unite the members of the proposed unit, but also what either unites them or differentiates them from others. If you had that kind of a fact pattern, and if the board wrote an opinion explaining we think that's a very significant fact because it's unique to members of this unit, and they're going to bargain over that, and they have conflicting interests with others in the stores, and so it makes sense for them to have their separate bargaining unit. If you had an opinion like that, then depending on what the other similarities and differences were, that might be a different case. But as I think your question presumed, Your Honor, that's very different from this case. With respect to the Wheeling case, it is virtually indistinguishable from this case, and that's why one of the principal grounds on which the board distinguishes it is that it didn't apply the specialty health care framework, which underscores that the specialty health care test is a different test than what was applied before without having been justified by the board. With respect to the other stores that the unions council mentioned, first of all, those stores were taken over by Macy's. Those unions were formed when the stores were Filene's and Jordan Marsh stores, not Macy's stores, and there is nothing in this record about the bargaining history of those stores, how those units came to be. But in terms of you and several of the amici argue there's this parade of horribles that's going to result from the decision in this case, which I'm no expert on department stores. Maybe there's something to all that. But it seems like however those units developed, it does seem like it's a test case for whether having some salespeople unionized and some not, you know, whether that's going to wreak havoc on the sales floor. We simply don't know enough about what happened, what was agreed to, and why under what circumstances to say. But even on the face of those facts, all that's telling you is that you have a single unit that in some instances includes, in some instances excludes cosmetics. It's not sanctioning the sort of approach that the board has taken here of incremental unionizing and gerrymandering to form lots of individual potentially discreet units within particular stores, which would wreak havoc, particularly on the retail industry, given the disproportionate effect on the store as a whole that a single union with separate bargaining obligations and potentially separate strikes can have on a retail establishment. Lastly, with respect to the evidence of interchange, the board has certainly not in its opinion and also not here today, has yet to explain why a turnover of a quarter of the department is not significant interchange. And the board has yet to grapple with record evidence that all sales employees have to help out wherever needed, that's 50 to 51. Service any customer with any product, 35 to 36 and 104. That sales employees, and it happens all the time, that sales employees will ring up items for other departments, that's 35 to 36, 125 to 26, 136 and 152. There's simply record evidence that undermines the board's determinations here that there is no interchange. And in the face of that, that simply underscores the need for the board to explain why these facts that it's found are significant in this unit determination context. For that independent reason, even apart from the propriety of the specialty healthcare framework, the board's order should be reversed. It should additionally be reversed because the specialty healthcare framework is contrary to the act and contrary to the APA. Thank you, Mr. Pritchett.